**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 3 1 2024

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

| | |
|---|---|
| TERESA FAULKNER, individually and on behalf of all similarly situated persons, | **CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| Plaintiff, | |
| v. | **Civil Action No.   4:24-cv-651-DPM** |
| BRANCH MESSENGER, INC. and EVOLVE BANK & TRUST | CLASS REPRESENTATION |
| Defendants. | Jury Trial Demanded |
| | This case assigned to District Judge **Marshall** |
| | and to Magistrate Judge **Moore** |

Plaintiff Teresa Faulkner ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Branch Messenger, Inc. ("Branch") and Evolve Bank & Trust ("Evolve" and, collectively, "Defendants"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendants. Plaintiff makes the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record:

## NATURE OF THE ACTION

1.      Plaintiff brings this class action against Defendants for failing to secure their systems and data from cyberattacks.

2.      Defendant Branch is a financial technology software application ("fintech app"). mobile-first technology that provides financial and scheduling flexibility to hourly employees. The Company delivers a software that offers enterprises access to their frontline worker, such as the ability to deliver payments to them, as well as allows employees to budget, swap, and pick-up

more shifts.[1]

3.       Defendant Evolve is a bank.   It accepts deposits, makes loans, and provides

mortgage solutions, card facilities, and online banking services.  Evolve serves clients in the United

States.  Evolve works with fintech startups by providing banking services to these start-ups'

clients.

4.       Branch uses Evolve as its banking partner.   Branch website states: "Banking

Services provided by Evolve Bank & Trust, Member FDIC. The Branch Mastercard Debit Card is

issued by Evolve Bank & Trust pursuant to a license from Mastercard and may be used everywhere

Mastercard debit cards are accepted."2

5.       On or about June 25, 2024, Evolve announced that a "known cybercriminal

organization" stole its customers' personal  identification information ("PII") and posted it on the

dark web (the "Data Breach").   This PII included Branch customers' data. The data which the

Defendants collected from the Plaintiff and Class Members, and which was exfiltrated by

cybercriminals from the Defendants, were highly sensitive. Upon information and belief, the

exfiltrated data included personal identifying information ("PII") like individuals' names, health

insurance and treatment information.

6.       Upon information and belief, prior to and through the date of the Data Breach, the

Defendants obtained Plaintiff's and Class Members' PII and then maintained that sensitive data in

a negligent and/or reckless manner. As evidenced by the Data Breach, Evolve inadequately

maintained its network, platform, software, and technology partners—rendering these easy prey

for cybercriminals. As evidenced by the Data Breach, Branch performed inadequate, if any, due

---

[1] Bloomberg, "Branch Messenger Inc.", https://www.bloomberg.com/profile/company/1528868D:US?embedded-checkout=true (last accessed July 25, 2024).

[2] Branch, https://www.branchapp.com/ (last accessed July 25, 2024).

diligence before selecting Evolve as its banking partner, including permitting it to store Branch's clients' PII and other sensitive information.

7.      Upon information and belief, the risk of the Data Breach was known to the Defendants. Thus, the Defendants were on notice that its inadequate data security created a heightened risk of exfiltration, compromise, and theft.

8.      Then, after the Data Breach, the Defendants failed to provide timely notice to the affected Plaintiff and Class Members—thereby exacerbating their injuries. Ultimately, the Defendants deprived Plaintiff and Class Members of the chance to take speedy measures to protect themselves and mitigate harm. Simply put, the Defendants impermissibly left Plaintiff and Class Members in the dark—thereby causing their injuries to fester and the damage to spread.

9.      Even when the Defendants finally notified Plaintiff and Class Members of their PII's exfiltration, the Defendants failed to adequately describe the Data Breach and its effects.

10.      Today, the identities of Plaintiff and Class Members are in jeopardy—all because of the Defendants' negligence. Plaintiff and Class Members now suffer from a heightened and imminent risk of fraud and identity theft and must now constantly monitor their financial accounts.

11.      Armed with the PII stolen in the Data Breach, criminals can commit a litany of crimes. Specifically, criminals can now open new financial accounts in Class Members' names, take out loans using Class Members' identities, use Class Members' names to obtain medical services, use Class Members' identities to obtain government benefits, file fraudulent tax returns using Class Members' information, obtain driver's licenses in Class Members' names (but with another person's photograph), and give false information to police during an arrest.

12.      Plaintiff and Class Members will likely suffer additional financial costs for purchasing necessary credit monitoring services, credit freezes, credit reports, or other protective

measures to deter and detect identity theft.

13.     Plaintiff and Class Members have suffered—and will continue to suffer—from the loss of the benefit of their bargain, unexpected out-of-pocket expenses, lost or diminished value of their PII, emotional distress, and the value of their time reasonably incurred to mitigate the fallout of the Data Breach.

14.     Through this action, Plaintiff seeks to remedy these injuries on behalf of themselves and all similarly situated individuals whose PII were exfiltrated and compromised in the Data Breach.

15.     Plaintiff seeks remedies including, but not limited to, compensatory damages, treble damages, punitive damages, reimbursement of out-of-pocket costs, and injunctive relief—including improvements to Defendants' data security systems, future annual audits, and adequate credit monitoring services funded by Defendants.

## **PARTIES**

16.     Plaintiff Faulkner is a natural person and citizen of Denver County, Colorado. Faulkner is a customer of Defendant Branch.

17.     Defendant Branch is a fintech app.  It provides  mobile-first technology for the scheduling and payment to hourly employees.[3]  Branch uses Defendant Evolve as its banking partner.

18.     Defendant Evolve is a bank headquartered in West Memphis, Arkansas.[4]  Evolve wholly or primarily accepts deposits online, often through intermediary fintech apps which use

---

[3] Bloomberg, "Branch Messenger Inc.", https://www.bloomberg.com/profile/company/1528868D:US?embedded-checkout=true (last accessed July 25, 2024).
[4] Arkansas Secretary of State John Thurston, "Search Incorporations, Cooperatives, Banks and Insurance Companies", https://www.ark.org/corp-search/index.php/corps/results (last accessed on July 3, 2024).

Evolve as a banking services provider.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The aggregated claims of the individual class members exceed $5,000,000.00, exclusive of interest and costs, and all conditions are met.  In particular, Plaintiff is a resident of a state different from both Defendants.

20.     This Court has jurisdiction over the Defendant Evolve as Defendant  maintains its corporate headquarters in this District.

21.     This Court has jurisdiction over Defendant Branch because Branch conducts significant business in this District.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District and Defendant Evolve is headquartered in this district.

## GENERAL FACTUAL BACKGROUND

### *Defendants Collected and Stored the PII of Plaintiff and Class Members*

23.     Defendant Evolve is a bank.  It accepts deposits, makes loans, and provides mortgage solutions, card facilities, and online banking services. Evolve Bank serves clients in the United States.

24.     Defendant Branch uses Evolve bank to effectuate payment as for similar purposes, as its official banking partner.

25.     As a condition of receiving their services, Defendants require that their customers entrust them with highly sensitive information, including their PII.

26.     Upon information and belief, numerous fintech apps used Evolve as their banking partner. One of these entities was Branch. Within this relationship, Branch transferred and entrusted data, including Plaintiff's and Class Members PII, to Evolve.

27.     Upon information and belief, Evolve received and maintained the PII of Branch's customers, such as individuals' names, addresses, dates of birth, and Social Security numbers. These records are stored on Evolve's computer systems.

28.     Because of the highly sensitive and personal nature of the information Defendants acquire and store, Defendants knew or reasonably should have known that they stored protected PII and must comply with healthcare industry standards related to data security and all federal and state laws protecting customers' PII and provide adequate notice to customers if their PII is disclosed without proper authorization.

29.     When Defendants collect this sensitive information, it promises to use reasonable measures to safeguard the PII from theft and misuse.

30.     Defendants acquired, collected, and stored, and represented that it maintained reasonable security over Plaintiff's and Class Members' PII.

31.     Upon information and belief, Branch made no, or insufficient, efforts to ensure that Evolve complied with the requisite data security standards, and all federal and state laws regarding PII protection, before entrusting its clients' data to Evolve.

32.     By obtaining, collecting, receiving, and/or storing Plaintiff's and Class Members' PII, Defendants assumed legal and equitable duties and knew, or should have known, that they were thereafter responsible for protecting Plaintiff's and Class Members' PII from unauthorized disclosure.

33.     Upon information and belief, Evolve represented to its customers orally and in

written contracts, marketing materials, and otherwise that it would properly protect all PII it obtained. Upon information and belief, Evolve knew or reasonably should have known that these representation regarding protecting PII and PHI would be passed on to its customers' customers, such as the users of Branch app.

34.     Branch similarly represented that it took customer data security seriously and undertook to protect customer PII.

35.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII, including but not limited to, protecting their usernames and passwords, using only strong passwords for their accounts, and refraining from browsing potentially unsafe websites.

36.     Upon information and belief, Plaintiff and Class Members relied on Defendants to keep their PII confidential and securely maintained, to use this information for business and healthcare purposes only, and to make only authorized disclosures of this information.

37.     Evolve could have prevented or mitigated the effects of the Data Breach by better securing its network, properly encrypting its data, or better selecting its information technology partners. Branch could have prevented or mitigated the effects of the Data Breach by selecting a banking services provider that employs reasonable security measures to protect its customers' information.

38.     Defendants' negligence in safeguarding Plaintiff's and Class Members' PII was exacerbated by repeated warnings and alerts directed to protecting and securing sensitive data, as evidenced by the trending data breach attacks in recent years.

39.     Despite the prevalence of public announcements of data breaches and data security compromises, Defendants failed to take appropriate steps to protect Plaintiff's and

7

Class Members' PII from being compromised.

40.     Branch failed to conduct the necessary inquiries into Evolve data security practices, and selected Evolve, which had inadequate information security practices, as its banking partner.

41.     Evolve failed to properly select its information security partners.

42.     Evolve failed to ensure the proper monitoring and logging of the ingress and egress of network traffic.

43.     Evolve failed to ensure the proper monitoring and logging of file access and modifications.

44.     Evolve failed to ensure the proper training its and its technology partners' employees as to cybersecurity best practices.

45.     Evolve failed to ensure fair, reasonable, or adequate computer systems and data security practices to safeguard the PII of Plaintiff and Class Members.

46.     Branch and Evolve failed to timely and accurately disclose that Plaintiff's and Class Members' PII had been improperly acquired or accessed.

47.     Evolve knowingly disregarded standard information security principles, despite obvious risks, by allowing unmonitored and unrestricted access to unsecured PII.

48.     Defendants failed to provide adequate supervision and oversight of the PII with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather PII of Plaintiff and Class Members, misuse the PII and potentially disclose it to others without consent.

49.     Upon information and belief, Evolve failed to ensure the proper implementation of sufficient processes to quickly detect and respond to data breaches, security incidents, or intrusions.  Upon information and belief, Branch failed to ensure that Evolve had implemented

8

such processes before selecting Evolve as its services provider.

50.    Upon information and belief, Evolve failed to ensure the proper encryption of Plaintiff's and Class Members' PII and monitor user behavior and activity to identify possible threats.  Upon information and belief, Branch failed to ensure that Evolve employed encryption in a reasonable manner, or at all, before selecting Evolve as its banking services provider.

### *The Data Breach*

51.    On or about June 25, 2024, Evolve confirmed that it was the subject of a ransomware attack.  The Data Breach was allegedly perpetrated by Lockbit ransomware gang. The bank confirmed that hackers "released illegally obtained data, including Personal Identification Information ("PII"), on the dark web."[5]  "The data varies by individual but may include your name, Social Security Number, date of birth, account information and/or other personal information," the bank explained.[6]

52.    A number of fintech starts were affected by the Evolve Data Breach.  Industry publication TechCrunch reported that, among others, fintech starts Branch, EarnIn, Marqueta, Melio, Mercury, Yieldstreet and Wise were affected, and their customers' PII may have been stolen.[7]

53.    On its website, Defendant posted a statement, which acknowledges that Defendant was targeted in a ransomware attack, in which ransomware gang LockBit leaked its customers' PII.  The statement reads, in part:

---

[5] James Reddick, "Evolve Bank confirms data breach after brazen LockBit claims" (June 26, 2024), https://therecord.media/evolve-bank-data-breach-lockbit (last visited July 4, 2024).
[6] *Id.*
[7] Lorenzo Franceschi-Bicchierai, "Yieldstreet says some of its customers were affected by the Evolve Bank data breach" TechCrunch (July 2, 2024), online: https://techcrunch.com/2024/07/02/yieldstreet-says-some-of-its-customers-were-affected-by-the-evolve-bank-data-breach/ (last accessed July 2, 2024).

**What Happened**

In late May 2024, Evolve Bank & Trust identified that some of its systems were not working properly. While it initially appeared to be a hardware failure, we subsequently learned it was unauthorized activity. We engaged cybersecurity specialists to investigate and determined that unauthorized activity may have been the cause. We promptly initiated our incident response processes, stopped the attack within days, and have seen no new unauthorized activity since May 31, 2024. We engaged outside specialists to investigate what happened and what data was affected, as well as a firm to help us restore our services. We reported this incident to law enforcement.

While the investigation is ongoing, we want to share some important information about what we know so far. At this time, current evidence shows the following:

- ***This was a ransomware attack by the criminal organization, LockBit***.
- They appear to have gained access to our systems when an employee inadvertently clicked on a malicious internet link.
- There is no evidence that the criminals accessed any customer funds, but ***it appears they did access and download customer information from our databases and a file share during periods in February and May***.
- The threat actor also encrypted some data within our environment. However, we have backups available and experienced limited data loss and impact on our operations.
- We refused to pay the ransom demanded by the threat actor. ***As a result, they leaked the data they downloaded***. They also mistakenly attributed the source of the data to the Federal Reserve Bank. (Emphasis added.)

54.     Jason Mikula, a fintech reporter, wrote on June 20, 2024, that "The situation at Evolve Bank & Trust, which powers dozens of fintech programs with millions of end users, went from bad to worse last week."  While Evolve was "still struggling to deal with the fallout from the bankruptcy and reconciliation issues linked to one-time banking-as-a-service partner Synapse", the bank was hit with "what may be one of the widest-reaching public data breaches in US history."

10

Mr. Mikula reported that the Data Breach involved the exfiltration of some 33 terabytes of data, equivalent to some 2.8 billion pages of text.[8]

55.     Mr. Mikula noted that Evolve is "arguably the most prolific partner bank supporting fintech programs" and has "powered services or capabilities" for the following firms, all of which have likely lost their clients' PII in the Data Breach: Affirm, Airwallex, Alloy, Apto Payments, Asset Lab, B9, Bilt, BlockFi (bankrupt), Bond (BaaS platform acquired by FIS), Branch (powers instant payout and EWA programs for major business like Uber and Fetch and franchise operators of brands like Pizza Hut, Jimmy John's, and Dunkin Donuts), Brightside, Buffpay, Bushel Exchange, ByteFederal, Cadre, ChangeFi, Clearing, Dave, Deserve (credit card-as-a-service platform), Earnin', EquityZen, eusoh, Every, Extra, Finch Money, FloatMe, Flycoin, FTX (bankrupt), Gerald, Grid, GigWage, GloriFi (shutdown), GoChanged, GravyStack, Hightop, Juno, Kyshi, Lumanu, Melio, Mercury, Nomad, Paceline, Palolo, PayGears, Paystand, PrideCard, PrizePool, Profit Business Bank, Qoins, RBR, RelayFi, Rho, Rollfi, Sail, Save, Series Financial, Shopify (via Stripe Treasury), Sila (payment processing platform), Sila, Solid (banking-as-a-service platform), SoLo Funds, Starlight, Status Money (shutdown), Step, Stilt (acquired by JG Wentworth), Stripe Treasury, Swype, Synapse (ongoing bankruptcy), TabaPay, TeamUP, Unbanked, Wise (until late 2023), YieldStreet, Yorbis, ZELF, and Zirtue.[9]

56.     Evolve's poor cybersecurity practices are long-standing and led to regulatory action against Defendant.    The St. Louis Federal Reserve Bank and the Arkansas State Banking Department launched a "wide ranging enforcement action" against Evolve, stemming from their

---

[8] Jason Mikula, "Evolve Hack Crisis: Russia-Linked cybergang Leaks Records on Millions" *Fintech Business Weekly* (June 30 ,2024), https://fintechbusinessweekly.substack.com/p/evolve-hack-crisis-russia-linked (last visited July 3, 2024).
[9] *Id.*

2023 safety and soundness examination.  The enforcement action mandated "a plan and timetable

to correct information technology security deficiencies."[10]

### *Actions Following the Data Breach*

57.     Following the Data Breach, the Plaintiff received a letter from Branch,

which stated, in relevant part:

> We are writing to inform you that some of your personal information was recently
> impacted when Evolve Bank & Trust ("Evolve") was the victim of a cybersecurity
> attack. Evolve provides financial services including Banking-as-a-Service products to
> host accounts and provide mobile banking. **This incident did not impact your funds
> stored with Evolve**.
>
> Please read this notice carefully, as it provides up-to-date information on what
> happened and what we are doing, as well as information on how you can obtain
> complimentary credit monitoring.
>
> **What happened?**
>
> On May 29, 2024, Evolve identified that some of its systems were not working
> properly. While it initially appeared to be a hardware failure, we subsequently learned
> it was unauthorized activity. Evolve promptly initiated its incident response processes
> and stopped the attack. No new unauthorized activity on Evolve's systems has been
> identified since May 31, 2024. An investigation with assistance from a cybersecurity
> firm was initiated to investigate what happened and what data may have been
> impacted. Evolve also notified law enforcement and worked to add further protections
> to harden its systems.
>
> **What personal information was involved?**
>
> There is no evidence that the threat actors accessed any customer funds, but it appears
> the threat actors did access and download customer information from Evolve's
> databases and a file share during periods in February and May 2024.
>
> Within these downloaded files, Evolve identified the following personal information
> about you: Social Security Number.

---

[10] Jason Mikula, "Evolve Hit with Fed Enforcement Action, But Why Did It Take This Long?" *Fintech Business Weekly* (June 23, 2024), https://fintechbusinessweekly.substack.com/p/evolve-hit-with-fed-enforcement-action (last visited July 3, 2024).

**What we are doing:**

Evolve is offering you a complimentary 24-month membership to TransUnion's credit monitoring and identity theft protection services. We are also providing you with proactive fraud assistance to help with any questions that you might have or in the event that you become a victim of fraud. These services will be provided by Cyberscout, a TransUnion company specializing in fraud assistance and remediation services. Please see Attachment A below for additional details regarding these services. **You must enroll by October 31, 2024, to receive these services**.

Prior to the incident, Evolve had a significant number of cybersecurity measures in place. Since becoming aware of the incident, Evolve has taken steps to further strengthen its security response protocols, policies and procedures, and its ability to detect and respond to suspected incidents.

**What you can do:**

It is always a good idea to remain vigilant against threats of identity theft or fraud and to regularly review and monitor your account statements and credit history for any signs of unauthorized transactions or activity. You can also enroll in the TransUnion service being offered to you. Additional information about how to protect your identity and personal information is contained in Attachment B below.

**For more information:**

A dedicated call center is also being set up to answer your questions about this incident. You may call it toll free at 866-238-9974, Monday through Friday 8 a.m. to 8 p.m. ET (excluding major U.S. holidays).

58.     In sum, aside from offering a 24-month credit monitoring and identity theft protection services, which is wholly inadequate, because the risks of identity theft continue for a lifetime, the Defendants largely put the burden on Plaintiff and Class Members to take measures to protect themselves.

59.     Time is a compensable and valuable resource in the United States. According to the U.S. Bureau of Labor Statistics, 55.5% of U.S.-based workers are compensated on an hourly basis,

while the other 44.5% are salaried.[11]

60.      According to the U.S. Bureau of Labor Statistics' 2018 American Time Use Survey, American adults have only 36 to 40 hours of "leisure time" outside of work per week;[12] leisure time is defined as time not occupied with work or chores and is "the time equivalent of 'disposable income.'"[13] Usually, this time can be spent at the option and choice of the consumer, however, having been notified of the Data Breach, consumers now have to spend hours of their leisure time self-monitoring their accounts, communicating with financial institutions and government entities, and placing other prophylactic measures in place to attempt to protect themselves.

61.      Plaintiff and Class Members are now deprived of the choice as to how to spend their valuable free hours and seek renumeration for the loss of valuable time as another element of damages.

62.      Upon information and belief, the unauthorized third-party cybercriminals gained access to Plaintiff's and Class Members' PII with the intent of engaging in misuse of the PII, including marketing and selling Plaintiff's and Class Members' PII.

63.      Aside from the offer of 24 months of identity monitoring services, which is inadequate for reasons described above, Defendants have offered no measures to protect Plaintiff

---

[11] *Characteristics of minimum wage workers, 2020*, U.S. BUREAU OF LABOR STATISTICS https://www.bls.gov/opub/reports/minimum-wage/2020/home.htm#:~:text=%20In%202020%2C%2073.3%20million%20workers,wage%20of%20%247.25%20per%20hour (last accessed March 18, 2024); *Average Weekly Wage Data*, U.S. BUREAU OF LABOR STATISTICS, *Average Weekly Wage Data, https://www.bls.gov/news.release/pdf/wkyeng.pdf* (last accessed March 18, 2024) (finding that on average, private-sector workers make $1,145 per 40-hour work week.).
[12] Cory Stieg, *You're spending your free time wrong — here's what to do to be happier and more successful*, CNBC https://www.cnbc.com/2019/11/06/how-successful-people-spend-leisure-time-james-wallman.html (Nov. 6, 2019) (last accessed March 18, 2024).
[13] *Id.*

and Class Members from the lifetime risks they each now face. As another element of damages, Plaintiff and Class Members seek a sum of money sufficient to provide Plaintiff and Class Members identity theft protection services for their respective lifetimes.

64.     Evolve and Branch had and continue to have obligations created by reasonable industry standards, common law, state statutory law, and its own assurances and representations to keep Plaintiff's and Class Members' PII confidential and to protect such PII from unauthorized access.

65.     Plaintiff and the Class Members remain, even today, in the dark regarding the scope of the data breach, what particular data was stolen, beyond several categories listed in the letter as "included" in the Data Breach, the particular ransomware used, and what steps are being taken, if any, to secure their PII and financial information going forward. Plaintiff and Class Members are left to speculate as to the full impact of the Data Breach and how exactly the Defendants intend to enhance their information security systems and monitoring capabilities so as to prevent further breaches.

66.     Plaintiff's and Class Members' PII and financial information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII and financial information for targeted marketing without the approval of Plaintiff and/or Class Members. Either way, unauthorized individuals can now easily access the PII and/or financial information of Plaintiff and Class Members.

## RANSOMWARE THREATENS FINANCIAL SERVICES

67.     Ransomware is a subset of malware in which the data on a victim's computer, or network, is locked, typically by encryption, and where payment is demanded as a condition of providing the decryption key to unlock the encrypted data and once again make that data available

to the victim.[14] The motive for ransomware attacks is nearly always monetary, and the demanded payment is almost always in some form of crypto-currency, typically Bitcoin.[15]

68.     Various forms of ransomware have been used to attack corporate as well as individual user systems since as early as 2013. The Cryptolocker strain of ransomware posed as a Trojan horse (malware contained or incorporated within otherwise legitimate-seeming websites, applications, or attachments to emails or messages). In 2017, the WannaCry ransomware attacked and encrypted more than 300,000 Microsoft Windows systems globally, demanding payment in Bitcoin in exchange for the data decryption key. WannaCry's mode of operation closely follows ransomware's general methodology:

> When executed, the WannaCry malware first checks the "kill switch" domain name; if it is not found, then the ransomware encrypts the computer's data, then attempts to exploit the SMB vulnerability to spread out to random computers on the Internet, and "laterally" to computers on the same network. As with other modern ransomware, the payload displays a message informing the user that files have been encrypted, and demands a payment of around $300 in bitcoin within three days, or $600 within seven days.[16]

69.     Even where the extortionist's payment demand is relatively small (ranging between hundreds of dollars to tens of thousands of dollars), the damage wreaked on enterprise and other users' systems reaches hundreds of millions of dollars and more.

70.     Unlike a data breach, whose seriousness results from the exfiltration and criminal usage of personally identifiable information, a ransomware attack renders data stored within a computer network or individual computer both unreadable and completely inaccessible to the enterprise or computer user.

---

[14] Ransomware, http://searchsecurity.techtarget.com/definition/ransomware (last visited March 2, 2024)
[15] *Id.*
[16] WannaCry Ransomware Attack, https://en.wikipedia.org/wiki/WannaCry_ransomware_attack (last visited March 2, 2024)

71.     Accordingly, banks and financial services companies, such as the Defendant, are especially attractive targets for ransomware.  A Conference of State Bank Supervisors document warned that *"[r]ansomware continues to present a major threat to the financial sector*. This method of attack used by bad actors has evolved from the basic encryption of data to now include variations utilizing double and triple extortion, as well as distributed denial of service attacks (DDoS). For the financial sector, ransomware is much more than a financial issue of paying a ransom or a fee to recover stolen data. ***Ransomware also represents an operational threat and, in some instances, a threat to the very survival of the institution.***"[17]

72.     Other goods and services providers are not immune from ransomware attacks. In mid-2017, pharmaceutical giant Merck was the subject of the ransomware strain known as "NotPetya." Merck's business was brought to a virtual halt, and the cost to Merck, as of October 2017, amounted to more than $300 million, including more than $175 million in lost business,[18] with the costs to insurers having been estimated at $275 million.[19]

73.     It was widely known that ransomware attacks were a threat to banking and other financial services entities, in 2024. Indeed, the first ransomware attack was reported to occur in 1989.[20]

74.     LockBit ransomware gang, which allegedly attacked Defendant and caused the

---

[17] Conference of State Bank Supervisors, "Ransomware: Lessons Learned by Banks That Suffered an Attack", https://www.dob.texas.gov/sites/default/files/files/Bank-Trust-Companies/Ransomware-Lessons-Learned-Banks.pdf (last accessed July 3, 2024), emphasis added.
[18] Patrick Howell O'Neill, NotPetya Ransomware Cost Merck More than $310 Million, Cyber Scoop (Oct. 27, 2017), https://www.cyberscoop.com/notpetya-ransomware-cost-merck-310-million/ (last visited March 18, 2024).
[19] Reuters Staff, Merck Cyber Attack May Cost Insurers $275 Million: Verisk's PCS, Reuters (Oct. 19, 2017), https://www.reuters.com/article/us-merck-co-cyber-insurance/merck-cyber-attack-may-cost-insurers-275-million-verisks-pcs-idUSKBN1CO2NP (last visited March 18, 2024).
[20] Nate Lord, A History of Ransomware Attacks: The Biggest and Worst Ransomware Attacks of All Time, Digital Guardian (Dec. 7, 2017), https://digitalguardian.com/blog/history-ransomware-attacks-biggest-and-worst-ransomware-attacks-all-time (last visited March 18, 2024).

Data Breach, has been very well known for many years prior to the Data Breach.   According to Blackberry, "LockBit establishes control of a victim's system, collects network information, and achieves primary goals such as stealing and encrypting data.  LockBit attacks typically employ a double extortion tactic to encourage victims to pay, first, to regain access to their encrypted files and then to pay again to prevent their stolen data from being posted publicly."[21]

75.    LockBit gang has Russian origins.  It maintains a dark web portal on The Onion Router, where it recruits talent and releases the data of victims held by companies who refuse to meet their demands.[22]

76.    LockBit ransomware has been implicated in more cyberattacks this year than any other ransomware, making it the most active ransomware in the world.  LockBit was first observed in September 2019.[23]  It should not have come as a surprise to Defendant that LockBit ransomware gang would target it.  Yet, Defendant failed to take basic precautions to prevent the Data Breach.

## DEFENDANT FAILED TO COMPLY WITH FTC GUIDELINES

77.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[24]

78.    In 2016, the FTC updated its publication, *Protecting Personal Information: A*

---

[21] Blackberry, "What Is LockBit Ransomware?", https://www.blackberry.com/us/en/solutions/endpoint-security/ransomware-protection/lockbit (last accessed July 3, 2024).
[22] *Id.*
[23] *Id.*
[24]Federal Trade Commission, *Start With Security*, *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Aug. 24, 2020).

*Guide for Business*, which established cybersecurity guidelines for businesses.[25] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

79.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[26]

80.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

81.     Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[25] Federal Trade Commission, *Protecting Personal Information: A Guide for Business, available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protecting-personal-information.pdf (last visited Aug. 24, 2020).

[26] FTC, *Start With Security, supra* note 23.

19

82.     Defendant was at all times fully aware of its obligation to protect the PII of its clients because of its position as a financial services provider.  Defendant was also aware of the significant repercussions that would result from its failure to do so.

## PLAINTIFF AND THE CLASS SUFFERED DAMAGES

### *The Experiences and Injuries of Plaintiff and Class Members*

83.     Plaintiff and Class Members are customers of Branch, one of the fintech apps that use Evolve as their banking partner.  Plaintiff Faulkner uses Branch to receive payment for her work.

84.      As a prerequisite of using its services, Branch requires its customers' customers—like Plaintiff and Class Members—to disclose their PII.  It then shares that PII with Evolve, its banking partner.

85.     When Branch finally announced the Data Breach, it deliberately underplayed the Breach's severity and obfuscated the nature of the Breach. Branch's Breach Notice fails to explain how the breach occurred (what security weakness was exploited), what exact data elements of each affected individual were compromised, who the Breach was perpetrated by, and the  extent to which those data elements were compromised.

86.     Because of the Data Breach, Defendants inflicted injuries upon Plaintiff and Class Members. And yet, Defendants have done little to provide Plaintiff and the Class Members with relief for the damages they suffered.

87.     All Class Members were injured when Defendants caused their PII to be exfiltrated by cybercriminals.

88.     Plaintiff and Class Members entrusted their PII to Defendants. Thus, Plaintiff had the reasonable expectation and understanding that Evolve would take—at minimum—industry

standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify them of any data security incidents. Plaintiff had reasonable expectation and understanding that Branch would exercise reasonable care in selecting its banking services provider. After all, Plaintiff would not have entrusted their PII to Defendants had they known that Evolve would not take reasonable steps to safeguard their information.

89.     Plaintiff and Class Members suffered actual injury from having their PII compromised in the Data Breach including, but not limited to, (a) damage to and diminution in the value of their PII—a form of property that Defendants obtained from Plaintiff; (b) violation of their privacy rights; (c) the likely theft of their PII; (d) fraudulent activity resulting from the Breach; and (e) present and continuing injury arising from the increased risk of additional identity theft and fraud.

90.     As a result of the Data Breach, Plaintiff and Class Members also suffered emotional distress because of the release of their PII—which they believed would be protected from unauthorized access and disclosure. Now, Plaintiff and Class Members suffer from anxiety about unauthorized parties viewing, selling, and/or using their PII for nefarious purposes like identity theft and fraud.

91.     Plaintiff and Class Members also suffer anxiety about unauthorized parties viewing, using, and/or publishing their information related to their medical records and prescriptions.

92.     Because of the Data Breach, Plaintiff and Class Members have spent—and will continue to spend—considerable time and money to try to mitigate and address harms caused by the Data Breach.

*Plaintiff and the Proposed Class Face Significant Risk of Present and Continuing Identity Theft*

93.     Plaintiff and Class Members suffered injury from the misuse of their PII that can be directly traced to Defendants.

94.     The ramifications of Branch's selection of Evolve as its banking services provider, and of Evolve's failure to keep Plaintiff's and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name and Social Security Number.

95.     According to experts, one out of four data breach notification recipients become a victim of identity fraud.[27]

96.     As a result of Defendants' failures to prevent—and to timely detect—the Data Breach, Plaintiff and Class Members suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

   a.   The loss of the opportunity to control how their PII is used;

   b.   The diminution in value of their PII;

   c.   The compromise and continuing publication of their PII;

   d.   Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

   e.   Lost opportunity costs and lost wages associated with the time and effort

---

[27] Anne Saita, "Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims", Threat Post, (Feb. 20, 2013) https://threatpost.com/study-shows-one-four-who-receive-data-breach-letter-become-fraud-victims-022013/77549/ (last visited on March 18, 2024).

expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

    f.   Delay in receipt of tax refund monies;

    g.   Unauthorized use of stolen PII; and

    h.   The continued risk to their PII, which remains in the possession of Evolve and is subject to further breaches so long as Evolve fails to undertake the appropriate measures to protect the PII in their possession.

    97.    Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.[28]

    98.    The value of Plaintiff's and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

    99.    It can take victims years to spot or identify PII theft, giving criminals plenty of time to milk that information for cash.

    100.   One such example of criminals using PII for profit is the development of "Fullz" packages.[29]

---

[28] Brian Stack, "Here's How Much Your Personal Information Is Selling for on the Dark Web," EXPERIAN (Dec. 6, 2017) https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited on March 18, 2024).

[29] "Fullz" is fraudster-speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more

101. Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

102. The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other members of the proposed Class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

103. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

---

information you have on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz", which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, "Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm," KREBS ON SECURITY, (Sep. 18, 2014) https://krebsonsecurity.com/tag/fullz/ (last visited on March 18, 2024).

104.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Defendants did not rapidly report to Plaintiff and the Class that their PII had been stolen.

105.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

106.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

107.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and the Class will need to remain vigilant against unauthorized data use for years or even decades to come.

108.    The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[30]

109.    The FTC has also issued numerous guidelines for businesses that highlight the

---

[30] "Commissioner Pamela Jones Harbour: Remarks Before FTC Exploring Privacy Roundtable," FED. TRADE COMMISSION (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited on March 18, 2024).

importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making.[31] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[32]

110.    According to the FTC, unauthorized PII disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money, and patience to resolve the fallout.[33] The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act (the "FTCA").

111.    To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. See *In the matter of Lookout Services, Inc.*, No. C-4326, Complaint ¶ 7 (June 15, 2011) ("[Respondent] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ¶ 7 (Mar. 7, 2006)

---

[31]    "Start With Security, A Guide for Business," FED. TRADE COMMISSION, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited March 18, 2024).
[32] *Id.*
[33] "Taking Charge, What to Do If Your Identity is Stolen," U.S. DEPARTMENT OF JUSTICE, at 3 (January 2012), https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last visited on March 18, 2024).

("[Respondent] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Respondent] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . .").

112.     These orders, which all preceded the Data Breach, further clarify the measures businesses must take to meet their data security obligations. Defendants thus knew or should have known that its data security protocols were inadequate and were likely to result in the unauthorized access to and/or theft of PII.

113.     Charged with handling highly sensitive PII including, financial information, and insurance information, Defendants knew or should have known the importance of safeguarding the PII that was entrusted to it. Defendants also knew or should have known of the foreseeable consequences if their data security systems were breached. This includes the significant costs that would be imposed on Defendants' customers as a result of a breach. Evolve nevertheless failed to take adequate cybersecurity measures to prevent the Data Breach from occurring, and Branch failed to inquire which, if any, security measures Evolve employed to safeguard its clients' information before selecting Evolve as its data storage services provider.

114.     Branch's selection of Evolve as its data storage services provider, and Evolve's use

of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for privacy, and has failed to adequately protect the PII of Plaintiff and potentially thousands of members of the proposed Class to unscrupulous operators, con artists, and outright criminals.

115.    Defendants' failure to properly notify Plaintiff and members of the proposed Class of the Data Breach exacerbated Plaintiff's and members of the proposed Class's injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

## CLASS ACTION ALLEGATIONS

116.    Plaintiff seeks relief in their individual capacity and as representative of all others who are similarly situated. Pursuant to Fed. R. Civ. P. 23(a) and (b)(2), (b)(3), and (c)(4), Plaintiff seek certification of the following subclasses (together, the "Class"):

> All customers of Branch Messenger, Inc., located in the United States, whose PII was affected by the data breach which occurred at Evolve on or about June 25, 2024.

117.    Excluded from the above Class are Defendant, including any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by any of Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families.

118.    **Numerosity**. Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous that the joinder of all members is impractical. While the exact number of Class members is unknown to Plaintiff at this time, Defendant provides services to hundreds of thousands of

individual clients.

119.    **Commonality**. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and

fact common to the Class, which predominate over any questions affecting only individual Class

members. These common questions of law and fact include, without limitation:

a.   If Defendants unlawfully used, maintained, lost, or disclosed Plaintiff's and
     Class Members' PII;

b.   If Branch failed to implement and maintain reasonable security procedures and
     practices appropriate to the nature and scope of the information compromised
     in the Data Breach;

c.   If Branch failed to adequately vet or otherwise inquire into Evolve's data
     security practices before entrusting its clients' data to Evolve;

d.   If Defendants' data security systems prior to and during the Data Breach
     complied with applicable data security laws and regulations;

e.   If Defendants' data security systems prior to and during the Data Breach were
     consistent with industry standards;

f.   If Defendants owed a duty to Class Members to safeguard their PII;

g.   If Defendants breached their duty to Class Members to safeguard their PII;

h.   If Defendants knew or should have known that Defendants' data security
     systems and monitoring processes were deficient;

i.   If Defendants should have discovered the Data Breach earlier;

j.   If Defendants took reasonable measures to determine the extent of the Data
     Breach after it was discovered;

k.   If Defendants' delay in informing Plaintiff and Class Members of the Data

29

Breach was unreasonable;

l.  If Defendants' method of informing Plaintiff and Class Members of the Data Breach was unreasonable;

m.  If Defendants' conduct was negligent;

n.  If Plaintiff and Class Members were injured as a proximate cause or result of the Data Breach;

o.  If Plaintiff and Class Members suffered legally cognizable damages as a result of Defendants' misconduct;

p.  If Branch breached its contracts with Plaintiff and Class Members;

q.  If Evolve breached implied contracts with Plaintiff and Class Members;

r.  If Defendants was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

s.  If Defendants failed to provide notice of the Data Breach in a timely manner; and

t.  If Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

120.   All members of the proposed Class are readily ascertainable. Defendants have access to the addresses and other contact information for members of the Class, which can be used for providing notice to many Class members.

121.   **Typicality**. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of other Class members because Plaintiff were denied the ability to access their funds deposited with Evolve, like every other class member.

122.   **Adequacy of Representation**. Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and

adequately represent and protect the interests of the members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions, including privacy litigation.

123.    **Superiority of Class Action**. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

124.    Damages for any individual class member are likely insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go un-remedied without certification of the Class.

125.    Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2), because Defendant has acted or has refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

## FIRST CAUSE OF ACTION

### Negligence

### (On Behalf of Plaintiff and the Class)

126.    Plaintiff re-alleges and incorporates by reference paragraphs 1-125 of the Complaint as if fully set forth herein.

127.    Defendants required Branch's customers to submit Plaintiff's and Class Members' non-public PII to Defendants to receive Defendants' services.

128.    By collecting and storing this data in its computer system and network, and sharing

it and using it for commercial gain, Evolve owed a duty of care to use reasonable means to secure and safeguard its computer system—and Plaintiff's and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Evolve's duty included a responsibility to implement processes so they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

129.    Branch owed a duty to Plaintiff and Class Members to select a data storage services provider that employed reasonable data security measures to protect their PII and other information.  Branch failed to conduct a reasonable, or any, inquiry when it selected Evolve to provide banking services and store its clients' sensitive information.

130.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable to both Defendants. Given that Evolve holds vast amounts of PII, it was inevitable that unauthorized individuals would at some point try to access Evolve's databases of PII.

131.    After all, PII is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members. Thus, Defendants knew, or should have known, the importance of exercising reasonable care in handling the PII entrusted to them.

132.    Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their, or their service providers', systems and networks, and the personnel responsible for them, adequately protected the PII.

133.    Defendants' duty of care to use reasonable security measures arose because of the

special relationship that existed between Defendants and Plaintiff and Class Members, which is recognized by laws and regulations, as well as common law. Defendants were in a superior position to ensure that their, and their service providers', systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

134.   Defendants failed to take appropriate measures to protect the PII of Plaintiff and the Class. Defendants are morally culpable, given the prominence of security breaches in the financial services industry, including the insurance industry. Any purported safeguards that Defendants had in place were wholly inadequate.

135.   Defendants breached their duty to exercise reasonable care in safeguarding and protecting Plaintiff's and the Class Members' PII by failing to adopt, implement, and maintain adequate security measures to safeguard that information, despite known data breaches in the financial service industry, and allowing unauthorized access to Plaintiff's and the other Class Members' PII. In addition, Branch breached its duty to exercise its reasonable care in safeguarding and protecting Plaintiff's and the Class members' PII by failing to conduct adequate due diligence on Evolve's data security practices and procedures before engaging Evolve as its banking services provider.

136.   The Defendants were negligent in failing to comply with industry and federal regulations in respect of safeguarding and protecting Plaintiff's and Class Members' PII.

137.   But for Defendants' wrongful and negligent breach of their duties to Plaintiff and the Classes, Plaintiff's and Class Members' PII would not have been compromised, stolen, and viewed by unauthorized persons. Defendants' negligence was a direct and legal cause of the theft of the PII of Plaintiff and the Classes and all resulting damages.

138.   Defendants owed Plaintiff and Class Members a duty to notify them within a

reasonable time frame of any breach to their PII. Defendants also owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. This duty is necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps in an effort to mitigate the fallout of the Data Breach.

139.    Defendants owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals who Defendants knew or should have known would suffer injury-in-fact from its inadequate security protocols. After all, Defendants actively sought and obtained the PII of Plaintiff and Class Members.

140.    Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' PII.  In addition, Branch breached its duties by failing to conduct an adequate inquiry into Evolve's data security practices and procedures, before engaging Evolve as its banking services provider. But for Defendants' negligence, Plaintiff and Class Members would not have been injured. The specific negligent acts and omissions committed by Defendants include, but are not limited to:

        a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

        b.   Failing to comply with—and thus violating—FTCA and its regulations;

        c.   Failing to adequately monitor the security of its networks and systems;

        d.   For Branch, failing to conduct an adequate inquiry into Evolve's data security practices and procedures;

        e.   Failing to have in place mitigation policies and procedures;

        f.   Allowing unauthorized access to Class Members' PII;

g.  Failing to detect in a timely manner that Class Members' PII had been compromised; and

h.  Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

141.   It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the financial service industry. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

142.   The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class members' PII. Defendants knew or should have known that their systems and technologies for processing and securing the PII of Plaintiff and the Classes had security vulnerabilities.

143.   As a result of Defendants' negligence, the PII, PHI, and other sensitive information of Plaintiff and the Classes was compromised, placing them at a greater risk of identity theft and their PII being disclosed to third parties without the consent of Plaintiff and the Class members.

144.   Simply put, Defendants' negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injuries-in-fact and damages. These injuries include, but are not limited to, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence.

Moreover, injuries-in-fact and damages are ongoing, imminent, and immediate.

145.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

## SECOND CAUSE OF ACTION

### Negligence *Per Se*

### (On Behalf of Plaintiff and the Class)

146.    Plaintiff re-alleges and incorporates by reference paragraphs 1-125 of the Complaint as if fully set forth herein.

147.    Under the Federal Trade Commission Act, Defendants had a duty to employ reasonable security measures. Specifically, this statute prohibits "unfair . . . practices in or affecting commerce," including (as interpreted and enforced by the FTC) the unfair practice of failing to use reasonable measures to protect confidential data.[34]

148.    Moreover, Plaintiff's and Class Members' injuries are precisely the type of injuries that the FTCA guards against. After all, the FTC has pursued numerous enforcement actions against businesses that—because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices—caused the very same injuries that Evolve inflicted upon Plaintiff and Class Members.

149.    Defendants' duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential PII.

150.    Defendants' failure to comply with FTCA statutory duties and standards of conduct constitutes negligence per se.  Defendants' failure to comply with the requisite standard of care

---

[34] 15 U.S.C. § 45.

caused the Breach, exposing Plaintiff's and Class Members' PII to cyber-criminal and causing Plaintiff and Class Members pecuniary and non-pecuniary harm detailed herein.

151.   Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (1) strengthen their data security systems and monitoring procedures; (2) submit to future annual audits of those systems and monitoring procedures; and (3) continue to provide adequate credit monitoring to all Class Members for the remainders of their lives.

### THIRD CAUSE OF ACTION
**Breach of Contract**
**(On Behalf of the Plaintiff and the Class)**

152.   Plaintiff re-alleges and incorporates by reference paragraphs 1-125 of the Complaint as if fully set forth herein.

153.   Plaintiff and Class Members entered into valid and enforceable contracts through which they provided labor and their PII to Defendants. That contract included promises by Defendant to secure, safeguard, and not disclose Plaintiff's and Class Members' PII.

154.   Plaintiff and Class Members fully performed their obligations under their contracts with Defendant.

155.   However, Defendants did not secure, safeguard, and/or keep private Plaintiff's and Class Members' PII, and therefore Defendants breached their contracts with Plaintiff and Class Members.

156.   Defendants allowed third parties to access, copy, and/or exfiltrate Plaintiff's and Class Members' PII without permission. Therefore, Defendants breached the contract with Plaintiff and Class Members.

157.   As a result, Plaintiff and Class Members have been harmed, damaged, and/or injured as described herein, including in Defendants' failure to fully perform its part of the bargain

with Plaintiff and Class Members.

158.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

159.    Plaintiff and Class Members are entitled to compensatory, consequential and nominal damages suffered as a result of the Data Breach.

160.    Plaintiff and Class Members would not have entered into employment contract with Defendants, or would have demanded significantly higher wages, had they been aware that Defendants would fail to take basic precautions to safeguard their PII.

161.    In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, inter alia, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide credit monitoring and identity theft insurance to Plaintiff and Class Members for a period of ten years.

**FOURTH CAUSE OF ACTION**
**Implied Contract**
**(On Behalf of the Plaintiff and the Class)**

162.    Plaintiff re-alleges and incorporates by reference paragraphs 1-125 of the Complaint as if fully set forth herein.

163.    This cause of action is pleaded in the alternative to breach of contract, above.

164.    Plaintiff and Class Members were required to deliver their PII to Defendants as part of using apps provided by Defendant Branch, because Evolve was Branch's banking partner.

165.    Defendants solicited, offered, and invited Plaintiff and Class Members to provide their PII as part of Defendants' regular business practices. Plaintiff and Class Members accepted Defendants' offers and provided their PII to Branch, who provided it to Evolve.

166.    Defendants accepted possession of Plaintiff's and Class Members' PII, for the

ostensible purpose of providing banking services to them, as users of Branch app.

167.    Plaintiff and Class Members entrusted their PII to Defendants. In so doing, Plaintiff and Class Members entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and Class Members if their data had been breached and compromised or stolen.

168.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations (including FTC guidelines on data security) and were consistent with industry standards.

169.    Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

170.    The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendants on the other, is demonstrated by their conduct and course of dealing.

171.    Plaintiff and Class Members would not have entrusted their PII to Defendants in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

172.    Plaintiff and Class Members would not have entrusted their PII to Defendants in

the absence of its implied promise to monitor its computer systems and networks to ensure that they adopted reasonable data security measures.

173.     Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendants.  Defendants, on the other hand, breached their obligations under the implied contracts with Plaintiff and Class Members by failing to safeguard their PII and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

174.     As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiff and Class Members sustained damages, including, but not limited to: (i) theft of their PII; (ii) lost or diminished value of PII; (iii) uncompensated lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PII, which (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

175.     Plaintiff and Class Members are entitled to compensatory, consequential and nominal damages suffered as a result of the Data Breach.

176.     Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members for a lifetime.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

177.    Plaintiff re-alleges and incorporates by reference paragraphs 1-125 of the Complaint as if fully set forth herein.

178.    This cause of action is plead in the alternative to the breach of contract and breach of implied contract theory.

179.    Plaintiff and Class Members conferred a monetary benefit on Defendants, by paying money for Branch services, a portion of which was passed on by Branch to Evolve, and was intended to have been used by Defendants for data security measures to secure Plaintiff and Class Members' PII. Plaintiff and Class Members further conferred a benefit on Defendants in the form of their PII from which Defendants derived profits.

180.    Defendants enriched themselves by saving the costs it reasonably should have expended on data security measures to secure Plaintiff and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Evolve's failure to provide adequate security.

181.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

182.    Defendants acquired the monetary benefit, PII, through inequitable means in that

Defendants failed to disclose their inadequate security practices, previously alleged, and failed to maintain adequate data security.

183.    If Plaintiff and Class Members knew that Defendants had not secured their PII, they would not have agreed to give their money—or disclosed their data—to Evolve or Branch.

184.    Plaintiff and Class Members have no adequate remedy at law.

185.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered—and will continue to suffer—a host of injuries, including but not limited to: (1) actual identity theft; (2) the loss of the opportunity to determine how their PII is used; (3) the compromise, publication, and/or theft of their PII; (4) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (5) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (6) the continued risk to their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their possession; and (7) future expenditures of time, effort, and money that will be spent trying to prevent, detect, contest, and repair the impact of the Data Breach.

186.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members suffered—and will continue to suffer—other forms of injury and/or harm.

187.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from Plaintiff and Class Members.

### **PRAYER FOR RELIEF**

WHEREFORE Plaintiff, individually and on behalf of all others similarly situated, requests the following relief:

A. An Order certifying this action as a class action and appointing Plaintiff as Class representative, and the undersigned as Class Counsel;

B. A mandatory injunction directing Defendants to adequately safeguard the PII of Plaintiff and the Class hereinafter by implementing improved security procedures and measures, including but not limited to an Order:

    i. prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

    ii. requiring Defendants to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii. requiring Defendants to delete and purge the PII of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

    iv. requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' PII;

    v. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis;

vi.    prohibiting Defendants from maintaining Plaintiff's and Class Members' PII on a cloud-based database until proper safeguards and processes are implemented;

vii.    requiring Defendants to segment data by creating firewalls and access controls so that, if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

viii.    requiring Defendants to conduct regular database scanning and securing checks;

ix.    requiring Defendants to monitor ingress and egress of all network traffic;

x.    requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiff and Class Members;

xi.    requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xii.    requiring Defendants to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Defendants' networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated; and

44

xiii.   requiring Defendants to meaningfully educate all Class Members about the threats that they face because of the loss of its confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves.

C.   A mandatory injunction requiring that Defendants provide notice to each member of the Class relating to the full nature and extent of the Data Breach and the disclosure of PII to unauthorized persons;

D.   An injunction enjoining Defendants from further deceptive practices and making untrue statements about the Data Breach and the stolen PII;

E.   An award of damages, including actual, nominal, consequential damages, and punitive, as allowed by law in an amount to be determined;

F.   An award of attorneys' fees, costs, and litigation expenses, as allowed by law;

G.   An award of pre- and post-judgment interest, costs, attorneys' fees, expenses, and interest as permitted by law;

H.   Granting the Plaintiff and the Class leave to amend this Complaint to conform to the evidence produced at trial;

I.   For all other Orders, findings, and determinations identified and sought in this Complaint; and

J.   Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury for any and all issues in this action so triable as of right.

Dated: July 31, 2024

Respectfully submitted,

Joseph Henry (Hank) Bates, III (ABN 98063)
Randall K. Pulliam (ABN 98105)
**CARNEY BATES & PULLIAM, PLLC**
One Allied Drive, Suite 1400
Little Rock, Arkansas 72202
Tel: (501) 312-8500
Fax: (501) 312-8505
Email: hbates@cbplaw.com
Email: rpulliam@cbplaw.com

John A. Yanchunis**\***
JYanchunis@forthepeople.com
Ronald Podolny**\***
ronald.podolny@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 North Franklin Street 7th Floor
Tampa, FL 33602
Tel: (813) 223-5505
Fax: (813) 223-5402

*\*Pro hac vice forthcoming*

*Counsel for Plaintiff and the Class*

████████████   ────────────────────────────────────────

**Subject:**          FW: Notice of Data Breach

July 11, 2024

**Re: Notice of Data Breach**

Faulkner, Teresa,

We are writing to inform you that some of your personal information was recently impacted when Evolve Bank & Trust ("Evolve") was the victim of a cybersecurity attack. Evolve provides financial services including Banking-as-a-Service products to host accounts and provide mobile banking. **This incident did not impact your funds stored with Evolve**.

Please read this notice carefully, as it provides up-to-date information on what happened and what we are doing, as well as information on how you can obtain complimentary credit monitoring.

**What happened?**

On May 29, 2024, Evolve identified that some of its systems were not working properly. While it initially appeared to be a hardware failure, we subsequently learned it was unauthorized activity. Evolve promptly initiated its incident response processes and stopped the attack. No new unauthorized activity on Evolve's systems has been identified since May 31, 2024. An investigation with assistance from a cybersecurity firm was initiated to investigate what happened and what data may have been impacted. Evolve also notified law enforcement and worked to add further protections to harden its systems.

**What personal information was involved?**

There is no evidence that the threat actors accessed any customer funds, but it appears the threat actors did access and download customer information from Evolve's databases and a file share during periods in February and May 2024.

Within these downloaded files, Evolve identified the following personal information about you: Social Security Number.

**What we are doing:**

Evolve is offering you a complimentary 24-month membership to TransUnion's credit monitoring and identity theft protection services. We are also providing you with proactive fraud assistance to help with any questions that you might have or in the event that you become a victim of fraud. These services will be provided by Cyberscout, a TransUnion company specializing in fraud assistance and remediation services. Please see <u>Attachment A</u> below for additional details regarding these services. **You must enroll by October 31, 2024, to receive these services**.

Prior to the incident, Evolve had a significant number of cybersecurity measures in place. Since becoming aware of the incident, Evolve has taken steps to further strengthen its security response protocols, policies and procedures, and its ability to detect and respond to suspected incidents.

**What you can do:**

It is always a good idea to remain vigilant against threats of identity theft or fraud and to regularly review and monitor your account statements and credit history for any signs of unauthorized transactions or activity. You can also enroll in the TransUnion service being offered to you. Additional information about how to protect your identity and personal information is contained in <u>Attachment B</u> below.

**For more information:**

A dedicated call center is also being set up to answer your questions about this incident. You may call it toll free at 866-238-9974, Monday through Friday 8 a.m. to 8 p.m. ET (excluding major U.S. holidays).

Sincerely,

Customer Support Team
Evolve Bank & Trust

### <u>Attachment A – Credit Monitoring Services</u>

To activate your membership and start monitoring your personal information please follow the steps below:

- Ensure that you **enroll by: October 31, 2024** (Your code will not work after this date.)
- Visit the TransUnion website to enroll: www.mytrueidentity.com
- Provide your **activation code:** ███████████

### <u>Attachment B – More Information about Identity Protection</u>

**INFORMATION ON OBTAINING A FREE CREDIT REPORT**

U.S. residents are entitled under U.S. law to one free credit report annually from each of the three major credit bureaus. To order your free credit reports, visit www.annualcreditreport.com or call toll-free (877) 322-8228.

**INFORMATION ON IMPLEMENTING A FRAUD ALERT OR SECURITY FREEZE**

You can contact the three major credit bureaus at the addresses below to place a fraud alert on your credit report. A fraud alert indicates to anyone requesting your credit file that you suspect you are a possible victim of fraud. A fraud alert does not affect your ability to get a loan or credit. Instead, it alerts a business that your personal information might have been compromised and requires that business to verify your identity before issuing you credit. Although this may cause some short delay if you are the one applying for the credit, it might protect against someone else obtaining credit in your name.

A security freeze prohibits a credit reporting agency from releasing any information from a consumer's credit report without written authorization. However, please be aware that placing a security freeze on your credit report may delay, interfere with, or prevent the timely approval of any requests you make for new loans, credit, mortgages, employment, housing, or other services. A credit reporting agency may not charge you to place, temporarily lift, or permanently remove a security freeze.

To place a fraud alert or security freeze on your credit report, you must contact the three credit bureaus below:

| **Equifax** | **Experian** | **TransUnion** |
|---|---|---|
| Consumer Fraud Division | Credit Fraud Center | TransUnion LLC |
| P.O. Box 740256 | P.O. Box 9554 | P.O. Box 2000 |

| | | |
|---|---|---|
| **Atlanta, GA 30374** | **Allen, TX 75013** | **Chester, PA 19022-2000** |
| **(888) 766-0008** | **(888) 397-3742** | **(800) 680-7289** |
| www.equifax.com | www.experian.com | www.transunion.com |

To request a security freeze, you will need to provide the following information:

1. Your full name (including middle initial as well as Jr., Sr., II, III, etc.);
2. Social Security number;
3. Date of birth;
4. If you have moved in the past five (5) years, the addresses where you have lived over those prior five years;
5. Proof of current address such as a current utility bill or telephone bill; and
6. A legible photocopy of a government issued identification card (state driver's license or ID card, military identification, etc.).

You may also contact the U.S. Federal Trade Commission ("FTC") for further information on fraud alerts, security freezes, and how to protect yourself from identity theft. The FTC can be contacted at 400 7th St. SW, Washington, DC 20024; telephone +1 (877) 382-4357; or www.consumer.gov/idtheft.

**ADDITIONAL RESOURCES**

Your state attorney general may also have advice on preventing identity theft, and you should report instances of known or suspected identity theft to law enforcement, your state attorney general, or the FTC.

**Colorado and Illinois residents:** You may obtain information from the Federal Trade Commission and the credit reporting agencies about fraud alerts and security freezes.

**Iowa Residents:** The Attorney General can be contacted at Office of Attorney General of Iowa, Hoover State Office Building, 1305 E. Walnut Street, Des Moines, Iowa 50319; +1 (515) 281-5164; www.iowaattorneygeneral.gov.

**North Carolina Residents:** The Attorney General can be contacted at 9001 Mail Service Center, Raleigh, NC 27699-9001; +1 (877) 566-7226 (Toll-free within North Carolina); +1 (919) 716-6400; or www.ncdoj.gov.

**New Mexico Residents:** You have rights under the federal Fair Credit Reporting Act (FCRA), which governs the collection and use of information pertaining to you by consumer reporting agencies. For more information about your rights under the FCRA, please visit https://www.consumer.ftc.gov/sites/default/files/articles/pdf/pdf-0096-fair-credit-reporting-act.pdf or www.ftc.gov.

**New York Residents:** The Attorney General can be contacted at the Office of the Attorney General, The Capitol, Albany, NY 12224-0341; +1 (800)-771-7755; or www.ag.ny.gov.

**For Arizona, California, Iowa, Montana, New York, North Carolina, Washington and West Virginia residents:** You may obtain one or more (depending on the state) additional copies of your credit report, free of charge. You must contact each of the credit bureaus directly to obtain such additional report(s).